

1    Thomas A. Christensen (ARDC #6215881)
     HUCK BOUMA PC
2    1755 South Naperville Road, Suite 200
     Wheaton, Illinois 60189
3    630-221-1755
     tchristensen@huckbouma.com
4    Attorney for Qui-Tam Plaintiff
5    TAXPAYERS AGAINST FRAUD, LLC



**FILED**

OCT 21 2024

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

6

7                        **UNITED STATES DISTRICT COURT**

8                   **FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| 9 **UNITED STATES OF AMERICA, _ex rel._** **TAXPAYERS AGAINST FRAUD, LLC,** | Case No. |
| 10 | **COMPLAINT FOR VIOLATION OF** **FEDERAL FALSE CLAIMS ACT** |
| 11  Plaintiff, | |
| 12 | **FILED UNDER SEAL** **PURSUANT TO 31 U.S.C. § 3730** |
| 13  vs. | **[DO NOT PLACE ON PACER]** |
| 14 **ROCKFORD UNIVERSITY,** | **PLAINTIFF DEMANDS TRIAL BY JURY** |
| 15 **a Corporation.** | |
| 16  Defendant. | Judge |

18

19                              **COMPLAINT**

Case No.: 1:24-cv-10849
Judge Virginia M. Kendall
Magistrate Judge Beth W. Jantz
Civil Direct Assignment/Cv Cat 3

20   **I. Introduction**

21        1.      This is a _qui tam_ action filed under the False Claims Act, 31 U.S.C. § 3729, _et seq._ (the

22   "FCA"), arising from false and fraudulent statements, certifications, and conduct of Defendant in

23   connection with the application for, receipt and retention of Paycheck Protection Program ("PPP")

24   funds arising out of and during the coronavirus, COVID-19 pandemic.

25        2.      In the face of the coronavirus pandemic, Congress enacted the Coronavirus Aid, Relief,

26   and Economic Security Act (the "CARES Act"), which included the Paycheck Protection Program

27   ("PPP"), a program implemented by the United States Small Business Administration ("SBA") with

28

                              COMPLAINT
                                   1

support from the Department of the Treasury. The Paycheck Protection Program authorized loans to small businesses, enabling them to retain workers and pay certain other expenses through the severe economic disruption caused by the coronavirus pandemic.

3.     The SBA passed rules limiting the types of borrowers eligible to receive PPP loans and those eligible for subsequent loan forgiveness. These limitations included criteria based on employee headcount, revenue volume, and net worth, all designed to ensure that properly qualified borrowers would receive funds to keep their workers on payroll during the pandemic disruption.

4.     On March 26, 2021, the United States Office of Public Affairs released the following statement: "The Department of Justice has led an historic enforcement initiative to detect and disrupt COVID-19 related fraud schemes," said Attorney General Merrick B. Garland. "The impact of the department's work to date sends a clear and unmistakable message to those who would exploit a national emergency to steal taxpayer-funded resources from vulnerable individuals and small businesses. We are committed to protecting the American people and the integrity of the critical lifelines provided for them by Congress, and we will continue to respond to this challenge."

5.     This action alleges that the Defendant was factually and legally ineligible to receive PPP funds under the underwriting standards established by the SBA eligibility rules. Plaintiff will show, using factual and evidentiary proof, that Defendant fraudulently applied for and received PPP loans in violation of the False Claims Act and fraudulently requested and received PPP loan forgiveness.

6.     This Action is brought by the Relator TAXPAYERS AGAINST FRAUD, LLC ("Relator") on behalf of the United States of America (the "United States" or the "Government") and against the named Defendant Rockford University, alleging violations of the FCA. Relator claims entitlement to a portion of any recovery obtained by the United States as a *qui tam* plaintiff authorized by 31 U.S.C. § 3730.

7.     As a direct result of its false and fraudulent statements, applications, certifications, and representations to the SBA and its approved lenders, Defendant collectively obtained $2,514,700 (two million, five hundred fourteen thousand, seven hundred dollars) in PPP loans that it was not eligible to receive.

8.     Through this action, Relator seeks to recover $2,543,430 (two million, five hundred forty-three thousand, four hundred twenty-nine dollars), or more in damages and civil penalties on behalf of the United States of America arising out of Defendant's and/or its agents' and employees' false and fraudulent applications, certifications, representations, records, statements and claims, which were made and/or caused to be made to the SBA or its approved lenders to be given PPP loans, and to later achieve forgiveness of those loans, in violation of the FCA.

9.     In October 2009, the Government Accountability Office released Report 10-108, which involved loan funding for assistance to service-disabled veterans,[1] which found in relevant part: "By failing to hold firms [i.e., ineligible, fraudulent borrowers] accountable, SBA and contracting agencies have sent a message to the contracting community that there is no punishment or consequences for committing fraud." The instant civil action is an effort to assist the SBA in fulfilling its objective of holding fraudulent, non-entitled PPP borrowers accountable to well-defined and easily understood lending standards and to recoup the Government's monetary losses resulting from this PPP-Borrower Defendant's fraudulent acquisition and forgiveness of PPP loan funding.

## II.     Parties, Jurisdiction, and Venue

10.     Relator, TAXPAYERS AGAINST FRAUD, LLC, is a Wyoming Limited Liability Company (herein the "Relator" or "Plaintiff") formed and dedicated to providing fraud notification to

---

[1] *Case Studies Show Fraud and Abuse Allowed Ineligible Firms to Obtain Millions of Dollars.* https://www.gao.gov/assets/gao-10-108.pdf

the Government through the United States Department of Justice (DOJ) for the ultimate benefit of the U.S. Treasury and taxpayers. Relator has engaged in extensive research and investigations to compile evidence, data, information, documentation, and analysis concerning Defendant's fraudulent PPP loans and to provide that evidence to government attorneys, agencies, and prosecutors, inclusive of the DOJ and SBA, to recoup ill-gotten gains, damages and civil penalties from fraudulent PPP borrowers.

11.     The Defendant named in this Complaint operates under law as a non-profit organization, exempt from state and federal tax obligations.  A non-profit organization operates for purposes other than generating profits, by which no part of the organization's income is distributed to its members, directors, or officers.  Plaintiff alleges that Defendant enjoyed that tax-exempt status while applying for and receiving the fraudulently induced PPP loans.

12.     Some states have adopted the Revised Model Nonprofit Corporation Act (1986). Under the Revised Model Nonprofit Corporation Act (1987) § 14.30, a court may dissolve a non-profit corporation (1) in a proceeding by the attorney general if it is established that the corporation has continued to exceed or abuse the authority conferred upon it by law; or if the directors or those in control of the corporation have acted, are acting or will act in a manner that is illegal, oppressive or fraudulent. In Illinois, the Secretary of State may dissolve any corporation if (e) It has misrepresented any material matter in any application, report, affidavit, or other document filed by the corporation pursuant to this Act" (805 ILCS 105/112.35) General Not for Profit Corporation Act of 1986.

13.     Government agencies, such as the Internal Revenue Service ("IRS"), can act against a not-for-profit organization for its fraudulent activities, including revoking its tax-exempt status.  Other consequences that may result from a not-for-profit's fraudulent conduct include the potential imposition of back taxes, and the individuals perpetrating the fraud may be subject to civil and/or criminal penalties.  The seriousness of these consequences underscores the importance of transparency, integrity, and lawful compliance with PPP loan eligibility and compliance rules by tax-exempt entities such as Defendant.

14.     Defendant, Rockford University, and its principals, agents, and employees are Illinois individuals, corporations, or other legally formed entities, organized, existing, conducting business, and having their principal place of business at 5050 East State St, Rockford, IL 61108, as stated on their PPP loan application(s). These individuals and entities reside in and/or operate within the geographic scope of and are therefore subject to personal and/or subject matter jurisdiction in the NORTHERN DISTRICT OF ILLINOIS for the actions, inactions, and torts alleged in this Complaint.

15.     This action arises under the False Claims Act, 31 U.S.C. §§ 3729-3733. This Court thus has jurisdiction over the subject matter herein pursuant to 28 U.S.C. § 1331 (Federal Question) and 31 U.S.C. § 3732(a), the latter of which specifically confers jurisdiction in United States District Court for actions brought under 31 U.S.C. §§ 3729 and 3730.

16.     Plaintiff/Relator alleges that the information, transactions, and allegations involving Defendant that are the subject of this Complaint are not the subject of a civil suit or an administrative civil monetary penalty proceeding in which the Government is already a party. Plaintiff/Relator alleges that the information, transactions, and allegations in this Complaint have not been "publicly disclosed" in any of the manners specified in 31 U.S.C. § 3730(e).[2] Moreover, even if such a public disclosure had occurred, of which Relator is unaware, Relator would be considered an "original source" of information, analysis, and "knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions" forming the gravamen of this Complaint. 31 USC § 3730(e)(4)(B)(2).

17.     The fact that the Defendant received PPP funding which was later forgiven was publicly disclosed by the SBA. Beyond that simple fact, TAXPAYERS AGAINST FRAUD, LLC, conducted extensive, independent research and investigation. This independent and costly work

_____

[2] Section 3730(e)'s public-disclosure bar was once deemed jurisdictional in nature but that is no longer the case after amendments to the FCA that were enacted in 2010 as part of the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 10104(j)(2), 124 Stat. 119, 901-02.

involved the acquisition, maintenance and protection of unique and proprietary facts, data, information, knowledge and analysis. TAXPAYERS AGAINST FRAUD'S work adds materially to publicly disclosed information, allegations and facts concerning these loans. TAXPAYERS AGAINST FRAUD, LLC, from their proprietary database, has delivered independent and material information relating to this Complaint to the United States Attorney for this District before filing this action, as required by 31 U.S.C. § 3730 (e)(4)(B)(2) and Federal Rule of Civil Procedure 4(i).

18.     Relator, through diligent design, creation and use of its unique and proprietary database, compiled through extensive independent investigations, paid research, Freedom of Information Act (FOIA) requests, provides, in this Sealed Complaint, certain invaluable and highly relevant, originally sourced documentary evidence concerning the Defendant and its actions, which justifies the Government, acting through the USDOJ, in exercising its veto power over any defensive assertion of the public disclosure bar.[3]

19.     Venue is proper in this district under 28 U.S.C. §§ 1391(b) and (c), 28 U.S.C. §1395, and 31 U.S.C. § 3732(a) because Rockford University can be found, resides, maintains its principal places of business, and transact business within this federal district's geographic scope and jurisdiction.

20.     Pursuant to U.S.C. § 3730(b), this Complaint is to be filed *in camera* and to remain under seal for at least sixty days and shall not be served on Defendant until the Court so orders. The Government may elect to intervene and proceed with the action within sixty days after the Government receives the Complaint or at such other time as the Court may order.

---

[3] In the alternative, even if a public disclosure did occur and Taxpayers Against Fraud, LLC fails to qualify as an original source, the Government has the sole veto power under 31 U.S.C. § 3730(e)(4)(A) to oppose any motion to dismiss based on that public disclosure bar, and, in that circumstance, the action is not subject to dismissal. (In a recent decision, U.S. ex rel. Vermont National Telephone Co. v. Northstar Wireless LLC, No. 15-0728, _ F. Supp. 3d_ , 2023 WL 7407301 (D.D.C. Nov. 19, 2023), a district court confirmed that the government's veto power over a dismissal based on the public disclosure bar of the False Claims Act (FCA) is absolute and can be effectuated by a mere notice of the government's opposition.)

## III.   SBA Loan Facts

21.     Rockford University listed its address on its SBA loan application as 5050 East State St, Rockford, IL 61108.

22.     Rockford University received a first draw PPP loan number 2634047105 on 4/11/2020 in the amount of $2,514,700 (two million, five hundred fourteen thousand, seven hundred dollars).  On 6/9/2021, this loan, including accrued interest totaling $2,543,430 (two million, five hundred forty-three thousand, four hundred twenty-nine dollars), was forgiven.[4]  Rockford University operates on a fiscal year that begins on July 1 and ends on June 30.

## IV.   LEGAL AND REGULATORY FRAMEWORK

### A.   Overview of the False Claims Act, as Applicable to This Complaint

23.     Originally enacted in the 1860s to combat fraud against the Union Army during the Civil War, the False Claims Act is the primary tool with which the United States combats false or fraudulent claims against the government and protects federal funds.

24.     The False Claims Act provides that a person is liable to the United States Government for each instance in which the person knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval.  31 U.S.C. § 3729(a)(1)(A).[5]

25.     The False Claims Act also makes liable any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B).

---

[4] https://data.thecalifornian.com/paycheck-protection-program-loans/illinois/rockford-university/2634047105

[5] While the submission of false or fraudulent claims to the Government for payment is the primary act punishable under the FCA, the Act also prohibits similar fraudulent conduct, including making false records or statements material to a false claim, § 3729(a)(1)(B), conspiring to violate the FCA, § 3729(a)(1)(C), and other related offense, § 3729(a)(1)(D)-(G).

26. The False Claims Act also contains a "reverse false claim" provision, which makes liable any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). The term obligation includes "the retention of any overpayment." *Id*. § 3729(b)(3). An "overpayment" means any funds that a person or entity receives or retains to which that person or entity is not entitled. See e.g. 42 U.S.C. § 1320a–7k(d)(4)(B).

27. The False Claims Act defines "knowingly" to mean that a person "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). The False Claims Act provides that no proof of specific intent to defraud is required. 31 U.S.C. § 3729 (b)(1)(B).

28. The False Claims Act defines the term "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

29. The False Claims Act defines the term "claim" to mean, in relevant part: "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that – (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government – (iii) provides or has provided any portion of the money or property requested or demanded; or (iv) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2)(A).

30.     The Supreme Court has held that the False Claims Act's provisions must be construed broadly to reach "all types of fraud, without qualification, that might result in financial loss to the Government." *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968). A request for payment made under a federal loan guarantee that was obtained in violation of a statute, regulation, or program requirement, by the use of a false statement or by means of other fraudulent conduct, qualifies as a "claim" under the False Claims Act. *Id.* at 232-33 (noting that the term "claim" is not limited to legally enforceable claims but includes all fraudulent attempts to cause the government to pay out money).

31.     The False Claims Act is an "expansive" statute, reaching "all types of fraud, without qualification, that might result in financial loss to the Government." *Cook County., Ill. v. United States ex rel. Chandler*, 538 U.S. 119, 129 (2003) (quoting *Neifert-White Co.*, 390 U.S. at 232).

32.     Any person who violates the False Claims Act "is liable to the United States Government for a civil penalty of not less than [$13,508] and not more than [$27,018], plus three times the amount of the damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a)(1) (emphasis added); 28 C.F.R. § 85.5(a); Pub. L. No. 101-410.[6]

33.     The provisions of the FCA can be enforced by the DOJ, which is empowered to bring actions of its own accord (*see* § 3730(a)), but the FCA also allows private individuals with knowledge of fraud to bring a suit on behalf of the government. § 3730(b)(1). These whistleblowers are known as *qui tam* relators.

34.     Relators are an important means of unearthing fraud on the Government. The United States Department of Justice has estimated that government fraud drains as much as 10% of the total

_____

[6] The exact amount of civil penalties actually increases over the years because they are subject to adjustment under the Federal Civil Penalties Inflation Adjustment Act of 1990. § 3729(a)(1) (citing Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. No. 101-410, § 5, 104 Stat. 890).

federal budget but noted that "most fraud goes undetected."[7] Whistleblower actions by private relators account for 64% of all successful FCA recoveries by the Government.[8] Without the assistance of these whistleblowers, the majority of fraud against public assets would go unaddressed. Wherever there is a significant investment of public assets, whistleblower programs like the FCA are necessary to ensure that those assets are used efficiently.

35.    To encourage relators to come forward and bring to light allegations of fraud that they are aware of, the FCA entitles relators to a portion of any monetary recovery obtained in a *qui tam* case. § 3730(d)(1), (2). In cases where the Government intervenes, the relator's share typically ranges from 15-25% of the total recovery, with the precise amount determined based on, *inter alia*, the relator's specific contributions to the action and whether the Government intervenes to pursue the claim.[9] Given the large recoveries under the FCA's treble damages regime, the relator's share serves as a powerful incentive for would-be whistleblowers.

## B.    The SBA Paycheck Protection Program

### 1.    SBA Loan Programs in General

36.    Created in 1953, the mission of the United States Small Business Administration is to help small business owners and entrepreneurs pursue the American dream. The SBA is a cabinet-level

---

[7] S. Rep. No. 99-345, at 2 (1986), as reprinted in 1986 U.S.C.C.A.N. 5266, 5268.

[8] U.S. Gov't Accountability Off., Information on False Claims Act Litigation 5 (2006), https://www.gao.gov/new.items/d06320r.pdf.

[9] Under § 3730(d)(1), if the Government intervenes, the relator is entitled to "receive at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim, depending upon the extent to which the person substantially contributed to the prosecution of the action." If the Government declines to intervene, the relator can receive an even larger share, between 25 percent and 30 percent of the case proceeds. § 3730(d)(2). If the Court finds that the relator planned and initiated false claims, they may be dismissed from the action and will receive no share of the recovery. § 3730(d)(3).

agency of the United States. It is fully dedicated to small businesses and provides counseling, capital, and contracting expertise as the nation's only go-to resource and voice for small businesses.

37.     The SBA works with lenders to provide loans to small businesses. The SBA does not lend money directly to small business owners. Instead, it sets guidelines for loans made by its partnering lenders, community development organizations, and micro-lending institutions.

38.     Loans guaranteed by the SBA range from small to large and can be used for most business purposes, including long-term fixed assets and operating capital. Certain loan programs set restrictions on how businesses can use the funds.

39.     Additionally, SBA loan programs have unique eligibility requirements. In general, eligibility is based on what a business does to receive its income, the character of its ownership, and where the business operates. Qualified businesses must meet size standards, be able to repay, and have a sound business purpose.

## 2.     The Paycheck Protection Program - PPP

40.     The Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act) (Pub. L. 116-136) was enacted in early 2020 to provide financial assistance to Americans suffering economic harm resulting from the COVID-19 pandemic. One source of relief provided by the Act was the authorization of forgivable loans to small businesses, which would facilitate employee retention through the maintenance of payroll, despite drastic reductions in company revenue, possible worker layoffs and certain other expenses. This was accomplished through a program referred to as the Paycheck Protection Program (PPP).

41.     To obtain a PPP loan, a qualifying business submitted a PPP loan application which was signed by an authorized representative of the business. The PPP loan application required the business (through its authorized representative) to acknowledge the PPP program's rules and to make certain affirmative certifications to receive the PPP loan, including representations that the business

was in operation on February 15, 2020. The business was also required to provide, among other things, its (a) average monthly payroll expenses and (b) number of employees (headcount). These figures were used to determine eligibility and to calculate the amount of money the business was eligible to receive under the PPP. In addition, businesses applying for a PPP loan were required to provide documentation of their payroll expenses to determine their eligibility.

42.     The CARES Act required PPP loan applications to be processed by a participating lender. If a PPP loan application met the approval criteria, the participating lender funded the PPP loan using its own monies, which were guaranteed by the SBA. Data from the application, including information about the borrower, the loan amount, the number of employees, and the volume of the business, were transmitted by the lender to the SBA, which then relied on those representations in processing the application and approving the loan.

43.     PPP loan proceeds were required to be used by the business for certain permissible expenses such as payroll costs, interest on mortgages, rent, and utilities. The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the business spent the loan proceeds on eligible expense items within a designated period and used a defined portion of the PPP loan proceeds on payroll expenses.

**3.     Laws, Regulations, and Guidance for the PPP**

44.     On March 27, 2020, the President signed the CARES Act to provide emergency assistance and health care response for individuals, families, and businesses affected by the coronavirus pandemic. The SBA received funding and authority through the CARES Act to modify existing loan programs and establish a new loan program to assist small businesses nationwide adversely impacted by the COVID-19 emergency.

45.     Section 1102 of the Act temporarily permits SBA to guarantee 100 percent of loans under Section 7(a) of the Small Business Act of 1953 (the "Small Business Act")[10], under a new program titled the Paycheck Protection Program ("PPP"). Section 1106 of the Act provides for forgiveness of up to the full principal amount of qualifying loans guaranteed under the PPP.

46.     Title I of the CARES Act established PPP under a new Section, 7(a)(36) of the Small Business Act. PPP was subsequently expanded by the Paycheck Protection Program and Health Care Enhancement Act, which was signed into law on April 24, 2020, and extended by the Paycheck Protection Program Flexibility Act (the "Flexibility Act"), which was signed into law on June 5, 2020.

47.     The SBA and the United States Department of the Treasury ("Treasury") worked together to implement the PPP, releasing regulations and guidance on a regular basis.

48.     Loans issued by lenders under the PPP were 100 percent guaranteed by SBA, and the full principal amount of the loans could qualify for loan forgiveness.

49.     Because PPP is a loan program under Section 7(a) of the Small Business Act, it is subject to the regulations applicable to SBA Section 7(a) business loans except when the CARES Act or applicable regulations provide otherwise.

50.     Section 7(a) loan regulations are generally found in 13 C.F.R. part 120. PPP was also made subject to the SBA "affiliation" rules, located at 13 C.F.R. § 121.301(f).

51.     In addition to the laws and regulations that apply to PPP loans, beginning in April 2020, the SBA has, on numerous occasions, issued ongoing official guidance regarding PPP loans. Two of the primary mechanisms used by the SBA to provide this guidance are interim final rules ("IFRs") and public answers to frequently asked questions ("SBA FAQs"). Specific guidance relevant to these actions is discussed below.

---

[10] Section 7(a) sets forth the primary business loan program for all business loans provided under the Small Business Act.

52.     SBA published its Interim Final Rule on Business Loan Program Temporary Changes; Paycheck Protection Program ("IFR #1") on April 2, 2020. Thereafter, it issued numerous additional IFRs, including IFRs issued on April 3, 2020 ("IFR #2" Applicable Affiliation Rules); April 28, 2020 ("IFR #4" Promissory Notes, Authorizations, Affiliation, and Eligibility); April 30, 2020 ("IFR #7" Corporate Groups and Non-Bank and Non-Insured Depository Institution Lenders); May 8, 2020 ("IFR #9" Extension of Limited Safe Harbor with Respect to Certification Concerning Need for PPP Loan Request); May 20, 2020 ("IFR #13" Second Extension of Limited Safe Harbor with Respect to Certification Concerning Need for PPP Loan and Lender Reporting); May 22, 2020 ("IFR #14" Loan Forgiveness; and "IFR #15" SBA Loan Review Procedures and Related Borrower and Lender Responsibilities); June 11, 2020 ("IFR #17" Revisions to First Interim Final Rule[11]); June 22, 2020 ("IFR #20" Revisions to Loan Forgiveness Interim Final Rule and SBA Loan Review Procedures Interim Final Rule[12]).  Each of these IFRs can be found on the SBA's website at

https://www.sba.gov/funding-programs/loans/covid-19-relief-options/paycheck-protection-program/ppp-lender-information#id-interim-final-rules.

53.     Between April 6, 2020, and June 13, 2023, the SBA published answers to questions about the PPP program on twenty-five occasions.[13] These regularly updated question-and-answer documents (the "SBA FAQ") are posted on the SBA and Treasury websites. The first version of the

_____

[11] IFR #17 revised IFR #1 to account for changes made by the Flexibility Act, which was signed into law in June 2020.

[12] IFR #20 revised IFR #14 and IFR #15 to account for changes made by the Flexibility Act.

[13] *See* https://www.sba.gov/document/support-faq-ppp-borrowers-lenders. Later versions generally included the questions from earlier versions, updating answers as needed, or if no updates were necessary, reprinting the original answers. Throughout this Complaint, Relator cites to the final Q&A version (version 25, published June 13, 2023, *available at* https://www.sba.gov/sites/default/files/2023-03/Paycheck-Protection-Program-Frequently-Asked-Questions_05%2013%2020.pdf), except where it is necessary to cite to earlier versions containing information that was later changed. Where appropriate, Relator provides information about the date on which the information in the Q&A was originally published by the SBA.

SBA FAQ was published on April 6, 2020, and included answers to 18 questions. By the end of April 2020, the SBA would release 7 additional versions of its AFAQ, which by April 29, 2020 (Version 8) had expanded to 39 questions. The most recent version (Version 25) was released on June 13, 2023, and included answers to 72 questions.

**4.      PPP Loan Eligibility**

54.      A business was eligible for a First Draw PPP loan if it met any one of the following standards:

i.      Together with its affiliates, it has 500 or fewer employees[14], regardless of their principal place of residence. *See* 15 U.S.C. § 636(a)(36)(D)(i)(I); SBA FAQ Question 44 (published May 13, 2020).

ii.      Together with its affiliates, it meets the SBA (employee-based or receipts-based) size standard for the North American Industry Classification System ("NAICS") code applicable to its primary industry.[15] *See* 15 U.S.C. § 636(a)(36)(D)(i)(II); SBA FAQ Question 3 (published April 6, 2020).

iii.      Its primary industry is in NAICS category 72 (accommodations and food service), and it has, together with its affiliates, no more than 500 employees per physical location. *See* 15 U.S.C. § 636(a)(36)(D)(iii)(I).

---

[14] On March 18, 2021, the SBA issued a final rule incorporating changes to the American Rescue Plan Act PPP, which applies to PPP loans approved and loan forgiveness applications submitted on or after March 11, 2021. Specifically, the SBA relaxed the employee rule to allow no more than 500 employees per physical location of the organization rather than simply 500 employees in total. (See https://www.federalregister.gov/d/2021-05930/p-27) Loan applicants must still qualify under the guidelines established under 53 ii and 53 iv above and *infra*. *(emphasis added)*

[15] SBA size standards based on industry codes are found in 13 C.F.R. § 121.201. https://www.ecfr.gov/on/2020-04-15/title-13/chapter-I/part-121

1
2
3
4
5
6
7
8

      iv.    On its own (i.e., regardless of its affiliates), it meets the size standard (employee-based or receipts-based) established by SBA for the NAICS code applicable to its primary industry, and together with its affiliates, it meets the size standard (employee-based or receipts-based) established by SBA for the NAICS code applicable to either its primary industry or the primary industry of itself and its affiliates on a combined basis, whichever standard is higher. *See* 13 C.F.R. § 121.301(a); SBA FAQ Question 2 (published April 6, 2020).

9
10
11

      v.    Housing cooperatives, eligible 501(c)(6) organizations, and eligible destination marketing organizations are eligible for a First Draw PPP Loan only if they employ no more than 300 employees.

12
13
14
15
16
17

      vi.    It has, together with its affiliates, $15 million or less of tangible net worth as of March 27, 2020, and $5 million or less of average net income after Federal income taxes (excluding carry-over losses) for the last two full fiscal years before the date of application.[16] *See* 15 U.S.C. § 632(a)(5)(B); SBA FAQ Question 2 (published April 6, 2020).

18
19
20
21
22
23
24
25

    55.    In counting employees for purposes of determining PPP eligibility, PPP applicants may use (a) their average number of employees over the previous 12 months, (b) their average number of employees for calendar year 2019, or (c) their average number of employees for each pay period during the last 12 calendar months completed prior to the loan application. If the business has been operational for less than 12 months, it may use the average number of employees for each of the pay periods that it has been operational. *See* 13 C.F.R. § 121.106(b); SBA FAQ Question 14 (published April 6, 2020). To meet the eligibility test of what constitutes an "employee" for PPP loan

26
27
28

---

[16] To qualify using this method, the loan recipient must have both $15 million or less *(emphasis added)* of tangible net worth as of March 27, 2020, and $5 million or less *(emphasis added)* of average net income for the last two full fiscal years

qualification, an expansive head-count test is used, which includes full-time, part-time, temporary, leased, and furloughed employees of the applicant's small business. *See* 13 C.F.R. § 121.106(a).

56. Of critical importance here, the SBA notes that "all borrowers should carefully review the required certification on the Paycheck Protection Program Borrower Application Form (SBA Form 2483), stating that 'current economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant.' *See* IFR #4 § 2(b).

57. SBA guidance further provides (*id*) that "Borrowers must make this certification in good faith, taking into account their current business activity and their ability to access other sources of liquidity sufficient to support their ongoing operations in a manner that is not significantly detrimental to the business." See SBA FAQ Question 31 (published April 23, 2020).

58. Unlike other SBA loans, which are available only to borrowers who are unable to obtain credit from sources other than the SBA, the CARES Act waived the "credit not available elsewhere" requirement for PPP loans. *See* 15 U.S.C. § 636(a)(36)(I). Thus, an applicant is not specifically required to show that it is unable to obtain credit elsewhere to get a PPP loan.

59. Nonetheless, PPP borrowers must still certify that the PPP loan is necessary as part of the loan application. SBA FAQ Question 31 (published on April 23, 2020).

60. For applicants who applied for and received a PPP loan but came to believe, based on subsequent SBA guidance, that they could not certify in good faith that current economic uncertainty rendered their PPP loan necessary to support ongoing operations, the SBA provided a safe harbor that permitted borrowers to repay PPP loans in full by May 18, 2020. *See* IFR #4 § 5, as modified by IFR #9 and IFR #13 § 1.[17] *See also* SBA FAQ Question 31, as modified by SBA FAQ Question 43 (published May 5, 2020) and SBA FAQ Question 47 (published May 13, 2020).

---

[17] The original safe harbor deadline was May 7, 2020, but that was subsequently extended through IFR #9 and IFR #13 to May 18.

61.    Further, concerning this "safe harbor" provision, the SBA stated that: "Any borrower that, *together with its affiliates* (emphasis added), received PPP loans with an original principal amount of less than \$2 million will be deemed to have made the required certification concerning the necessity of the loan request in good faith." Affiliation for this purpose is determined based on the rules that apply for determining eligibility for a PPP loan. *See* SBA FAQ Question 46 (published May 13, 2020).[18]

### 5.    PPP Loan Terms

62.    PPP loans funded before the enactment of the Flexibility Act mature two years from the date of funding, see Interim Final Rule § 2(j), unless modified by the lender and borrower. See Flexibility Act § 2(b). PPP loans funded after the enactment of the Flexibility Act on June 5, 2020 mature five years after the date of funding. See Small Business Act § 7(a)(36)(K)(ii), as amended by Flexibility Act § 2.

63.    No payments are due on a PPP loan until the SBA has notified the lender that no forgiveness will be allowed, but interest will accrue during that period. *See* 15 U.S.C. § 636(a)(36)(M)(ii), as amended by Flexibility Act § 3(c); Interim Final Rule § 2(n), as revised by IFR #17 § 1(c).

64.    Thereafter, most banks will charge monthly or quarterly principal and interest payments until maturity. However, any borrower that does not apply for forgiveness within ten months after the end of its eight-week or 24-week covered period must begin making payments of

---

[18] https://www.sba.gov/sites/default/files/2023-03/Paycheck-Protection-Program-Frequently-Asked-Questions_05%2013%2020_2.pdf. Question 46 was first published on May 13, 2020, and then revised twice in March 2021, before eventually being deleted from the FAQ in July 2021, after SBA discontinued the loan necessity questionnaire.

principal and interest on or after the expiration of that ten-month period. *See* 15 U.S.C.

§ 636(a)(36)(M)(v), as amended by Flexibility Act § 3(c).

65.     Lenders must notify borrowers when SBA pays the forgiveness amount or determines

that no forgiveness is allowed. *See* Interim Final Rule § 2(n), as revised by IFR #17 § 1(c).

**6.      The PPP Loan Application and Required Certifications**

66.     The PPP Loan Application form requires the applicant to certify its number of employees.

67.     The PPP Loan Application form also requires the applicant to identify all its "owners," which is defined as any member owning 20% or more of the applicant's equity.

68.     The loan application requires an express certification that the applicant "has read the statements included in this form, including the Statements Required by Law and Executive Orders, and I understand them."

69.     The loan application also requires an applicant's express certification that "[t]he [borrower] is eligible to receive a loan under the rules in effect at the time this application is submitted, that have been issued by the Small Business Administration (SBA) implementing the Paycheck Protection Program under Division A, Title I of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) (the Paycheck Protection Program Rule)."

70.     The loan application also necessitates a crucial certification that the applicant "employs no more than the greater of 500 employees or, if applicable, the size standard (employee-based or receipts-based) established by the SBA in 13 C.F.R. 121.201 for the Applicant's industry." This certification is of utmost importance, as it determines the eligibility of the applicant under the Paycheck Protection Program.

71.     The loan application also requires an express certification that "[a]ll SBA loan proceeds will be used only for business-related purposes as specified in the loan application and consistent with

the Paycheck Protection Program Rule." This emphasizes the importance of using the loan for its intended purpose and the responsibility of the applicant in ensuring its proper use.

72.     The loan application also requires the applicant to expressly certify that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant."

73.     The loan application requires an express certification that the funds will be used for specific purposes, such as retaining workers, maintaining payroll, making mortgage interest payments, lease payments, and utility payments. It is important for applicants to understand that if PPP loan funds are knowingly used for unauthorized purposes, the federal government may hold the applicant legally liable, including charges of fraud.

74.     The loan application also requires the applicant to expressly certify that "the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects" and that "[the applicant] understand[s] that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 USC 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to \$250,000; under 15 USC 645 by imprisonment of not more than two years and/or a fine of not more than \$5,000; and, if submitted to a federally insured institution, under 18 USC 1014 by imprisonment of not more than thirty years and/or a fine of not more than \$1,000,000."

75.     The loan application also requires the applicant to expressly certify that "[the applicant] acknowledge[s] that the lender will confirm the eligible loan amount using required documents submitted."

76.     The loan application requires a signature by an authorized representative of the applicant.

77.     As noted, at least with respect to larger companies and businesses owned by private companies with adequate sources of liquidity, the SBA has indicated that applicants must take into

account "their current business activity and their ability to access other sources of liquidity sufficient to support their ongoing operations in a manner that is not significantly detrimental to the business." *See* SBA FAQ Questions 31 (published April 23, 2020) and 37 (published April 29, 2020). Accordingly, in making the express certification, applicants are required to consider their need for PPP funding in light of SBA FAQ Question 31, stated above.

78.    Absent the applicable express certifications for a PPP loan as described above, the applicant is not eligible to receive PPP loan funds, and the lender cannot approve, nor can the SBA authorize funding of the PPP loan.

79.    Each of the foregoing PPP loan application certifications is a material condition to SBA's approval and payment of any claim submitted under the PPP. SBA does not review PPP loan applications for approval prior to the loan funds being disbursed; instead, it relies on its approved lenders to comply with SBA requirements and to ensure that each loan and borrower is, in fact, eligible for the PPP. The certifications are required for approval of the PPP loan application and for each applicant to receive payment of PPP loan funds. The certifications are critical to SBA's and the United States' ability to ensure that only qualified and eligible loans are approved and paid. These certifications are needed to protect SBA and the United States against undue risk, loss, and fraud.

80.    The SBA permitted any borrower that received a PPP loan and found, upon reconsideration, that it could not make the required certifications in light of SBA's guidance to repay the PPP loan in full by May 18, 2020. According to the SBA, it would deem any borrower that repaid by May 18, 2020, to have made the required certification of need in good faith. *See* IFR #4 § III (5) as modified by IFR #9 § III and IFR #13 § III (1); SBA FAQ Question 31 (published April 23, 2020), as modified by SBA FAQ Question 43 (published May 5, 2020) and SBA FAQ Question 47 (published May 13, 2020).

81.    On May 13, 2020, the SBA published FAQ Question and Answer 46 ("FAQ 46"), which provides a new safe harbor based on the principal amount of PPP loans received by a borrower

and its affiliates: "Any borrower that, together with its affiliates, received PPP loans with an original principal amount of less than $2 million will be deemed to have made the required certification concerning the necessity of the loan request in good faith." (Affiliation for this purpose is determined based on the rules that apply for determining eligibility for a PPP loan, as announced in IFR #2.)

82.     FAQ 46 also gives PPP borrowers with loans greater than $2 million that do not satisfy the new safe harbor a means to limit their exposure to sanctions from the SBA. If the SBA determines that such a borrower did not have an adequate basis for the certification of need, the SBA will notify the borrower and seek repayment in full of the PPP loan and tell the lender that the borrower is not eligible for loan forgiveness. FAQ 46 provides that SBA will not pursue further administrative enforcement or refer the borrower to other governmental agencies based on its determination regarding the certification of need if the borrower repays the loan in full after receiving notification from SBA. *See* SBA FAQ Question 46 (published May 13, 2020).

83.     Notably, repaying the loan pursuant to FAQ 46 does not shield the borrower from all potential liability. FAQ 46 merely states that SBA will not pursue additional action based on a determination that the borrower lacked an adequate basis for the certification of need. A borrower is still liable if there are other violations of the PPP statute or implementing regulations. Further, nothing in FAQ 46 prevents the Government or a *qui tam* relator or whistleblower who believes that the borrower knowingly made a false statement in connection with its PPP loan application from bringing a complaint under the False Claims Act.

## V.     Rockford University's False and Fraudulent Claims Surrounding Its Application for, Receipt of, and Failure to Repay PPP Funds

### A.  The False Claims Act Defines "Knowingly"

84.     The False Claims Act defines "knowingly" to mean that a person "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A).

The False Claims Act provides that no proof of specific intent to defraud is required. 31 U.S.C. § 3729(b)(1)(B).

## B. Rockford University Falsely Certified Compliance with the PPP Size Rules

### i. PPP Size Rules (¶¶ 85 – 88)

85.     The CARES Act expressly limits PPP loans to businesses with fewer than 500 employees or those otherwise qualifying as a small business concern under other SBA standards. There are certain limited exceptions, recited above, mentioned in ¶¶ 86 and 87 directly below, which are not operative here.

86.     A company must meet the size standard (employee-based or receipts-based) established by SBA for the NAICS code applicable to its primary industry, or the primary industry of itself and its affiliates on a combined basis, whichever standard is higher.

87.     The "alternative size standard" for PPP loans also allows businesses to qualify if, as of March 27, 2020, the maximum tangible net worth of the business *is not more than $15 million (emphasis added) and* their average net income after federal income taxes for the two full fiscal years before the date of the application was *not more than $5 million (emphasis added)*.

88.     According to the SBA's affiliation rules, businesses must include the employees of affiliate businesses in their size determinations. *See* 13 C.F.R. § 121.301(f); Affiliation Guidance.

### ii. Defendant(s) Factual misreporting of the number of Employees, Revenue, and Net Worth, as Certified in their Loan Application

89.     Rockford University, knowingly had more than 500 employees and gross revenue well beyond eligibility requirements at the time it filed its PPP loan application. *See* 15 USCS § 636(a)(36)(D)(i)(I); SBA FAQ Question 44. Rockford University according to Relator's research, in fact, had approximately 704 employees (seven hundred four) and an estimated annual gross revenue of over $38,346,195 (thirty eight million, three hundred forty-six thousand, one hundred ninety-five dollars) when it filed its PPP loan application. The company's numbers clearly exceeded the allowable

loan eligibility employee count and revenue limitations for PPP loan qualification set by the SBA and the Government.

90. Rockford University knowingly failed to meet the SBA revenue-based size standard for the NAICS code applicable to its primary industry (found in 13 C.F.R. § 121.201). 15 USCS § 636(a)(36)(D)(i)(II); SBA FAQ Question 3. Despite this fact and its otherwise glaring eligibility disqualifications, Rockford University knowingly and fraudulently misreported its revenue-based size standard, in direct violation of the FCA and of all applicable Government regulations and guidance.

91. Rockford University listed its NAICS code as 611310 ("Colleges, Universities and Professional Schools"), on its PPP loan application. The applicable revenue-based business size standard for NAICS code 611310 is $30,000,000 (thirty million dollars) in gross revenue. Accordingly, Rockford University was disqualified from receiving the loan because Rockford University exceeded the allowable NAICS size limit established by the SBA of $30,000,000 (thirty million dollars).

92. Rockford University primary industry is not NAICS category 72 (accommodations and food service). See 15 USCS § 636(a)(36)(D)(iii). Accordingly, Rockford University could not rely on that category's divergent and lower business size-standard test to qualify for PPP loans.

93. Rockford University does not meet the receipts/revenue-based size standard established by SBA for the NAICS code applicable to its primary industry. 13 C.F.R. § 121.301(a); SBA FAQ Question 2. The applicable revenue-based size standard of $30,000,000 (thirty million dollars) in gross revenue was exceeded by $8,346,195 (eight million, three hundred forty-six thousand, one hundred ninety-five dollars) or 28% (twenty-eight percent percent).

94. According to Rockford University's own financial records, their revenue amounts, and number(s) of employees, failed to meet SBA PPP loan qualifications.

95. Rockford University had $15 million or more of tangible net worth as of March 27, 2020. On that date, its actual tangible net worth was $38,359,323 (thirty eight million, three hundred

fifty-nine thousand, three hundred twenty-three dollars), which is 156% (one hundred fifty-six percent) over the PPP loan limits. more than the $15 million limit allowable under the PPP rules. See 15 USCS § 632(a)(5)(B); SBA FAQ Question 2.

96.     Based on the foregoing factual allegations, Relator/Plaintiff alleges that Rockford University knowingly and fraudulently misrepresented its employee count, gross revenues, and net worth, and thus its compliance with PPP size and affiliation rules, to wrongfully claim eligibility for a PPP loan.

97.     Rockford University knowingly made false certification of employee counts, gross revenues, and/or net worth, which were material and relied upon by the Government. Those false certifications affected its eligibility for the PPP loan and, in turn, nonetheless, influenced the SBA's decision to approve the loan.

98.     Rockford University knowingly, falsely, and fraudulently certified that it was in compliance with the applicable size, employee count, gross revenue, and net worth rules applicable to PPP loans when, in fact, it knew it was not in compliance with those rules

99.     The Government relied on Rockford University's false certifications and representations regarding its employee size and finances, allowing Rockford University to obtain PPP funds to which it was not entitled and to avoid repaying those funds when it was thus not qualified for loan forgiveness.

## D.     Rockford University Failed to Repay PPP Loan Funds, for Which It Was Not Entitled to Forgiveness

100.     Rockford University was ineligible to receive a PPP loan and subsequently failed, given the opportunity, to repay the wrongfully acquired PPP loan funds received, for which it was, knowingly, *ab initio,* ineligible.

101.     Rockford University did not take advantage of the SBA's safe harbor (repayment) provisions, which would allow borrowers to repay their misbegotten PPP loans by May 18, 2020.

Rockford University therefore, cannot be deemed to have made its required certifications of need in good faith. IFR #4 § 5, as modified by IFR #9 and IFR #13 § 1; SBA FAQ 31, as modified by FAQ Question 43 and FAQ Question 47.

102. Moreover, because Rockford University received and retained a loan exceeding two million dollars ($2,000,000), the statutory good faith safe harbor provision relating to necessity was unavailable to them. SBA FAQ Question 46.

103. Rockford University knowingly and fraudulently avoided and/or wrongfully concealed its clear obligations to return PPP loan funds to the government. Loan forgiveness was not legally available to Rockford University.

## VI. LEGAL CLAIMS

### COUNT I Violation of the False Claims Act (31 U.S.C. § 3729(a)(1)(A))

104. Relator repeats and realleges each of the foregoing paragraphs and allegations as though fully set forth.

105. Rockford University violated the False Claims Act, 31 U.S.C. § 3729(a)(1)(A), by knowingly presenting and/or causing to be presented to the SBA false and/or fraudulent claims for payment or approval in connection with its applications for, receipt of and failure to repay PPP loans.

106. The United States, through its SBA, paid, authorized, and/or approved the false and/or fraudulent claims submitted by Defendant because of and in reliance on Rockford University's concealments and misrepresentations, which payments, authorizations, and approvals of PPP loans would not have been paid or approved but for Defendant's unlawful conduct. The Government, the SBA, and their approved lenders, as well as the United States Taxpayers, all incurred substantial and provable monetary damages because of Defendant's fraudulent misconduct, in total amounts according to proof.

107.     Rockford University's conduct was knowing in that Defendant had actual or constructive knowledge that the claims, certifications, and statements made in connection with their applications for PPP loans and/or PPP loan forgiveness were false and fraudulent, and purposely submitted those false and fraudulent claims, certifications and statements made to receive and/or retain funds to which they were not legally entitled.

## COUNT II Violation of the False Claims Act (31 U.S.C. § 3729(a)(1)(B))

108.     Relator repeats and realleges each of the foregoing paragraphs and allegations as though fully set forth.

109.     Rockford University, violated the provisions of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, or causing to be made or used false records, certifications of fact or statements: (i) material to false or fraudulent claims for payment of loans, by lenders, authorized by the SBA; (ii) in order to fraudulently induce PPP loan funding to be paid or approved; and (iii) which claims the United States did in-fact pay or approve, all in connection with Rockford University 's receipt of (and failure to repay) PPP loans.

110.     The United States paid or approved the Defendant's false and/or fraudulent claims and applications because of Rockford University's acts and representations, which funding would not have been paid or approved but for Rockford University's unlawful and fraudulent conduct, thereby imposing on the Government and its taxpayers, the resulting monetary damages as herein set forth and according to further proof.

111.     Rockford University had actual and/or constructive knowledge that its claims, certifications, and statements made in connection with its application for a PPP loan and/or PPP loan forgiveness were false and fraudulent. Rockford University, nevertheless, intentionally submitted those claims, certifications, and statements in order to receive and/or retain funds to which they were not legally entitled.

## **COUNT III Violation of the False Claims Act's Reverse False Claims Provision (31 U.S.C. § 3729(a)(1)(G))**

112.    Relator repeats and realleges each of the foregoing paragraphs and allegations as though fully set forth.

113.    Defendant, Rockford University, violated the so-called "reverse false claim" provision of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G), by knowingly making or using a false record or statement for the purpose of avoiding or decreasing an obligation owed to the United States in connection with their receipt of and subsequent retention of PPP loan funding.

114.    Defendant, Rockford University, retained overpayments or avoided an obligation to repay PPP loan funds to the Government, and the United States and its taxpayers incurred substantial monetary damages as a result.

115.    Defendant, Rockford University's, conduct was knowing in that Rockford University had actual or constructive knowledge that the claims, certifications, and statements made in connection with their application(s) for PPP loan forgiveness were false and fraudulent, and nevertheless intentionally submitted those claims, certifications, and statements in order to retain and avoid repayment of funds to which they were not legally entitled.

116.    The acts, statements, certifications, and concealments herein alleged were made in knowing violation of cited sections of the FCA and other relevant laws and regulations, directly and proximately causing the monetary and other damages claimed by plaintiffs, justifying the relief sought below.

## **RELIEF REQUESTED**

WHEREFORE, Relator, acting on behalf of and in the name of the United States and on its own behalf, demands and prays that judgment be entered against Rockford University as follows:

**A.** That Rockford University pay to The United States Government the full amount of damages due at law, to include the enhanced, non-discretionary treble damages sum (31 U.S.C §§

3729(a)(1)(G) equivalent to three times the amount of damages the United States sustained due to Defendant's false and fraudulent actions herein alleged, plus civil penalties as required by law in the amounts of no less than $11,665 and no more than $23,331 for each violation of the False Claims Act;

**B.** That Relator be awarded the maximum sum authorized to be paid to a *qui tam* relator plaintiff under TITLE 31 U.S.C. §§ 3730(d)(1) and 3730(d)(2);

**C.** That Defendant return to the Government all of their ill-gotten PPP loan proceeds in an approximate sum, as hereafter calculated, in excess of $2,543,430 (two million, five hundred forty-three thousand, four hundred twenty-nine dollars);

**D.** That Defendant be ordered to pay to plaintiffs and the United States accrued pre-judgment and post-judgment interest accrued to-date at lawfully established rates;

**E.** That Relator be awarded all costs of this action, including its attorneys' fees, expenses, and allowable costs pursuant to 31 U.S.C. § 3730(d);

**F.** That Rockford University cease and desist from further violating the False Claims Act, 31 U.S.C. §§ 3729 et seq; and

**G.** That The United States and Relator be granted such other and further relief as the Court deems just and appropriate.

**RELATOR HEREBY DEMANDS A TRIAL BY JURY FOR ALL ISSUES SO TRIABLE**

Respectfully submitted,

Plaintiff: The UNITED STATES OF AMERICA *ex rel.* TAXPAYERS AGAINST FRAUD, LLC.

Date:  October 21, 2024

By their attorney,

Thomas A. Christensen, Esq.
HUCK BOUMA PC
Attorney for Plaintiff-Relator